Jake Taylor (Bar No. 10840)
Emma D. Tanner (Bar No. 18107)
CLYDE SNOW & SESSIONS
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Tel: (801) 322-2516
jst@clydesnow.com
etd@clydesnow.com

*Attorneys for Plaintiff Jenelle Molenda*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENELLE MOLENDA, an individual,<br><br>        Plaintiff,<br>v.<br><br>GARFIELD COUNTY SHERIFF'S OFFICE, a subdivision of the State of Utah; GARFIELD COUNTY, a political subdivision; GARFIELD COUNTY JAIL, a subdivision of the State of Utah; CREE CARTER, a/k/a Deputy Carter, an officer of the Garfield County Sheriff's Office, in both his individual and official capacities; WESLEY SYRETT, a/k/a Deputy Syrett, an officer of the Garfield County Sheriff's Office, in both his individual and official capacities; JIMMY OLDHAM, in both his individual and official capacities; JAMES D. PERKINS, an individual; BARRY HUNTINGTON, an individual; SCOTT BURNS, an individual; JOHN DOES 1-10; in both their individual and official capacities,<br><br>        Defendants. | **COMPLAINT**<br><br>**(Jury Demand)**<br><br><br>Civil No. _____<br><br>Judge: _____ |

Plaintiff JENELLE MOLENDA ("Ms. Molenda"), through her undersigned counsel of the law firm Clyde Snow & Sessions, P.C., hereby complains of the defendants GARFIELD

COUNTY, a political subdivision of the State of Utah; GARFIELD COUNTY SHERIFF'S

OFFICE, a subdivision of the State of Utah; GARFIELD COUNTY JAIL, a subdivision of the

State of Utah, CREE CARTER, a/k/a Deputy Carter, an officer of the Garfield County

Sheriff's Office ("Deputy Carter"); WESLEY SYRETT, a/k/a Deputy Syrett, an officer of the

Garfield County Sheriff's Office ("Deputy Syrett"); JIMMY OLDHAM, a/k/a Deputy

Oldham, an officer of the Garfield County Sheriff's Office ("Deputy Oldham"); JAMES D.

PERKINS, an individual; BARRY HUNTINGTON, an individual; SCOTT BURNS, an

individual; and JOHN DOES 1-10, as follows:

## PARTIES

1.      Plaintiff, JENELLE MOLENDA, is an individual residing in Panguitch, Garfield

County, State of Utah and at all times relevant to this case was a resident of the State of Utah.

2.      Defendant, GARFIELD COUNTY, is and at all times relevant to this case was a

political subdivision of the State of Utah.

3.      Defendant, GARFIELD COUNTY SHERIFF'S OFFICE, is and at all times

relevant to this case was a subdivision of the State of Utah.

4.      Defendant, GARFIELD COUNTY JAIL, is and at all times relevant to this case

was a subdivision of the State of Utah located in Garfield County.

5.      Defendant CREE CARTER, also known as Deputy Carter, is, upon information

and belief, a resident of Panguitch, Garfield County, State of Utah, and at all times relevant to

this case was an officer of the Garfield County Sheriff's Office.

6.      Defendant WESLEY SYRETT, also known as Deputy Syrett, is, upon

information and belief, a resident of Panguitch, Garfield County, State of Utah, and at all times

relevant to this case was an officer of the Garfield County Sheriff's Office.

7.     Defendant JIMMY OLDHAM, also known as Deputy Oldham, is, upon information and belief, a resident of Panguitch, Garfield County, State of Utah, and at all times relevant to this case was an officer of the Garfield County Sheriff's Office.

8.     Defendant JAMES D. PERKINS, also known as Sheriff Perkins, is, upon information and belief, a resident of Panguitch, Garfield County, State of Utah, and at all times relevant to this case was Sheriff of Garfield County, Utah.

9.     Defendant BARRY HUNTINGTON is, upon information and belief, a resident of Panguitch, Garfield County, State of Utah, and at all times relevant to this case was the Garfield County Attorney.

10.     Defendant SCOTT BURNS is, upon information and belief, a resident of Cedar City, Iron County, State of Utah, and at all times relevant to this case was the Piute County Attorney.

11.     The true names or capacities, whether individual, corporate, associate or otherwise of Defendants JOHN DOES 1-10, inclusive, are unknown to Ms. Molenda who therefore sues Defendants by fictitious names. Ms. Molenda is informed, believes, and thereon alleges that each of the Defendants designated herein as JOHN DOE is responsible in some manner for the events and happenings herein referred to and caused injury and damages proximately thereby to Ms. Molenda as alleged herein; that Ms. Molenda will ask leave of this Court to amend this Complaint to insert the true names and capacities of said JOHN DOE Defendants, inclusive, when the same have been ascertained by Ms. Molenda together with appropriate charging allegations, and to join such Defendants in this action.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action pursuant to 42 U.S.C. § 1983, as the Defendants acted under the color of state law and caused Ms. Molenda, a United States citizen, to be subjected to the deprivation of her rights, privileges, and immunities secured by the United States Constitution and the laws of the United States.

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the United States Constitution, as permitted through 42 U.S.C. § 1983 and the application of the United States Constitution to the states and their subdivisions through the Fourteenth Amendment to the United States Constitution.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1331(b), as all Defendants reside in the District of Utah, and a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in the District of Utah.

## GENERAL ALLEGATIONS

### *Background and Context*

15.     Ms. Molenda moved to Garfield County, Utah from Los Angeles, California in 2015. Her hope was to escape the overwhelming crowds and hustle and bustle that a life in Southern California involves.

16.     Despite Utah's harsher winters, Ms. Molenda was excited to start a new chapter of her life in a scenic rural county with an estimated 5,000 residents.

17.     Further excited to become a Utah small business owner, Ms. Molenda purchased the Adobe Sands Motel ("Adobe Sands") in Panguitch, Garfield County, Utah in August, 2015. The address of the Adobe Sands is 390 North Main Street, Panguitch, Utah 84759.

18.     Since purchasing the Adobe Sands, Ms. Molenda invested extensively in renovations and improvements to the services and amenities the Adobe Sands offers its local and out of town guests.

### A Small Town's Grudge

19.     Despite Ms. Molenda's sincere efforts to improve the Adobe Sands, her ownership came with an intense and ever-growing local distaste for her and her business.

20.     For many years, Ms. Molenda has hosted individuals in need, often sponsored by a local LDS Church Bishop, who need temporary housing assistance and support.

21.     Historically, the Bishop arranged for payment of rooms or apartments at the Adobe Sands to provide struggling individuals with a place to stay until they can get back on their feet. When asked, Ms. Molenda has almost always agreed to help.

22.     Unfortunately, some of these individuals have caused issues at the Adobe Sands. For example, one short-term renter was arrested on a warrant issued in another county for a previous incident unrelated to Ms. Molenda or the Adobe Sands.

23.     Another short-term renter lit a firecracker which led to multiple officers dressed in SWAT gear arriving and making a dramatic scene in front of other guests.

24.     In another instance, it was revealed that one of the sponsored tenants had a criminal history that Ms. Molenda was not made aware of even though she inquired about it. This renter caused property damage and was ultimately evicted after prolonged resistance.

25.     Panguitch residents have not shied away from expressing distaste for Ms. Molenda, the Adobe Sands, and the guests it supposedly attracts. Many local residents feel that Ms. Molenda is "enabling" or "encouraging" crime in the small town and should be held

personally responsible for the conduct of her guests. However, as of the date of this Complaint, none of the Adobe Sands guests have committed any crimes in Garfield County.

26.    Of course, Ms. Molenda has never intended to cause problems by offering rooms to individuals in need of short-term housing assistance. However, residents have openly retaliated against Ms. Molenda for the perceived problems she has caused the town. For instance, in August 2021, a local resident accused Ms. Molenda of shoplifting from the local Family Dollar store. This resulted in a criminal investigation against Ms. Molenda and her being banned from the store for months until the allegation was ultimately disproven.

27.    Other Panguitch business owners have a history of disparaging the Adobe Sands to those visiting the local national parks, explaining that the Adobe Sands is a "drug hotel" and "unsafe" for visitors. After Ms. Molenda confronted some of these business owners, they (the business owners) involved local law enforcement to personally reprimand Ms. Molenda.

28.    Residents also often air their grievances against Ms. Molenda and the Adobe Sands online. For example, in October 2021, an individual named Ed H. publicly alleged:

Everybody says you harbor thiefs [sic], robber and worse.
PANGUITCH RESIDENTS HAVE THE LEGAL RIGHT TO KNOW IF ANYONE HARBORS CRIMINALS.

If any homeowner finds out your tenant's committed a felony against their home, you are by law held accountable.

. . . .

You spread fear by not even answering a simple question. That makes you suspicious and appearing to work against us residents.

29.    In a letter to the editor of a local newspaper, Panguitch resident C.C. wrote:

What the town really needs is some modern motels. Some of the existing ones are being used as long term rentals. The sheriff's office has responded to an excessive

number of calls to one motel in the North part of town. It is my understanding that a lot of the tenants are homeless people from up North. I propose that we should do what a lot of cities have done and after a certain number of calls charge the property owner. That would encourage the owners to rent to a better class of people. We also need to inspect the motels on a regular basis. Some people have told me that they would sleep in their cars rather than stay in a motel here. Reading online reviews leads me to believe that there are a lot of health and building code violations that need to be corrected.

30.     The Adobe Sands' history of attracting law enforcement due to alleged

misbehavior by guests has earned Ms. Molenda a reputation with the Garfield County Sheriff's

Office and other authorities as a "problem" that needs to be eradicated.

31.     Since Ms. Molenda has become known for "enabling" crime in Panguitch, local

law enforcement and other officials/authorities have made blatant efforts to punish her and drive

her away.

32.     For example, Ms. Molenda attended a Panguitch town meeting during which

someone raised the "issues" the town had been facing because of guests at the Adobe Sands. Ms.

Molenda defended herself publicly, which resulted in the then-mayor angrily crossing his arms

and turning his back to her dismissively.

33.     Additionally, as a result of the incident with the firecracker, Ms. Molenda

attempted to assist then-Garfield County Sheriff, James D. Perkins ("Perkins"), in escorting

guests into their rooms. In response, Perkins, pointed directly at Ms. Molenda and angrily yelled

at her to "shut up."

34.     During this same incident, sheriff's deputies were recorded on video slamming

the firecracker suspect aggressively against the hood of a vehicle even though he was not

resisting arrest. He sustained injuries to his ribs and had to go to the hospital as a result.

35.     In another incident, Perkins and Deputy Carter were parked at the Adobe Sands

when Ms. Molenda approached to ask about why they were there. Perkins responded: "That's pretty damn nosey. Who the hell do you think you are?" Ms. Molenda was again dumbfounded by Perkins' attitude towards her.

36.     On another occasion, a sheriff's deputy named Deputy Oldham explained the basis for law enforcement's attempt to unlawfully impound Ms. Molenda's recreational vehicle ("RV") even though she had city approval to park it at the Adobe Sands. Deputy Oldham explained to Ms. Molenda that Perkins, the city manager, and the county attorney had a private meeting about the Adobe Sands. Deputy Oldham explained further that the impound order came from them.

37.     The county attorney, Barry Huntington ("Mr. Huntington"), reportedly explained to Ms. Molenda's then-counsel that these were retaliation efforts resulting from a specific family's repeated nuisance calls to law enforcement after being evicted from the Adobe Sands for bad behavior. This family was one of those the Bishop sponsored.

38.     Mr. Huntington reportedly described the Adobe Sands as a dilapidated homeless camp with people warming themselves around barrels. This description is consistent with the perceptions that local officials and authorities have developed of Ms. Molenda and the Adobe Sands.

39.     There have also been numerous occasions when local law enforcement officials have followed Ms. Molenda in Garfield County and elsewhere. Ms. Molenda's staff and long-term guests, too, have been followed around town by police and questioned after being pulled over about what they are doing in town and their "motives." Some guests have left town early due to feeling uncomfortable due to police harassment.

40.      Prior to moving to Panguitch, Ms. Molenda had no criminal history, and her record remains clean.

### *A Neighborly Misunderstanding*

41.      Daryl DeRose ("Mr. DeRose") moved to 350 North Main Street in Panguitch in 2019, intending to use the property as a vacation home. 350 North Main is immediately south of and adjacent to the Adobe Sands.

42.      Prior to July 2021, Ms. Molenda had only met Mr. DeRose and his wife a single time, as they generally do not occupy their Panguitch residence.

43.      On July 5, 2021, while Ms. Molenda was running errands, Mr. DeRose reportedly came to the Adobe Sands and began banging on Ms. Molenda's front door with his cane.[1]

44.      An employee, Randall Blake ("Mr. Blake"), witnessed Mr. DeRose hitting the door and approached him.

45.      Mr. DeRose confronted Mr. Blake, saying he had seen Mr. Blake trimming trees a few days prior and that he (Mr. Blake) had placed a pile of the trimmings in his (Mr. DeRose) yard.

46.      Though explaining that the trimmings had been taken to the dump before they could have been discarded on Mr. DeRose's property, Mr. Blake followed Mr. DeRose to see for himself.

47.      Upon seeing a pile of twigs on Mr. DeRose's property, Mr. Blake again explained that they did not come from the Adobe Sands.  However, Mr. DeRose refused to accept this

---

[1] Ms. Molenda resides at the Adobe Sands in Room Number 1. Her room is not marked aside from the identifying room number.

response.

48.    Mr. Blake provided Mr. DeRose with Ms. Molenda's phone number and later reported the confrontation to her.

49.    Mr. Blake had no further contact with Mr. DeRose. However, Mr. Blake checked on the twigs a couple of days later, on the evening of July 8 at around 5:00 p.m. By this time, they had been removed.

50.    That same day, July 5, 2021, Ms. Molenda received a call around 2:14 p.m. from Mr. DeRose's wife explaining that their back fence had been damaged and that there were sticks left on their property. Ms. Molenda agreed to come by later on to assess the situation.

51.    On July 6, 2021, around 2:30 p.m., Ms. Molenda stopped by the DeRose residence.  Mr. DeRose walked with her to the back fence.

52.    He was visibly angry and alleged again that Ms. Molenda's tenants had damaged his fence and cut and stacked wood in his yard. He admitted he had not seen this occur.

53.    Mr. DeRose then accused Ms. Molenda of discarding gutters onto his property. Ms. Molenda responded that the Adobe Sands did not have any gutters when she purchased it.

54.    When Mr. DeRose claimed the gutters matched the color of her building, Ms. Molenda held one up to show that it did not.

55.    Ms. Molenda then explained that the fencing was actually a few feet within the Adobe Sands' property line, so the discarded materials were, in fact, on the Adobe Sands' property, not Mr. DeRose's.

56.    Mr. DeRose acknowledged this and appeared to agree with Ms. Molenda's assessment.

57.    Ms. Molenda, however, acknowledged that the pile of sticks appeared to be situated partially on Mr. DeRose's property. Ms. Molenda explained that while she was not responsible for the sticks ending up on Mr. DeRose's property, she knew people who could "take care of things."

58.    By this, Ms. Molenda meant that she could arrange for removal of the sticks, as well as additional cleanup in Mr. DeRose's yard. However, Mr. DeRose seemed to interpret her statement as a threat that she had people available to her who could harm Mr. DeRose at her command.

59.    Mr. DeRose responded with anger and threatened to involve local authorities. Walking away from Mr. DeRose, Ms. Molenda again explained that she would have someone clean up the sticks and anything else he might need help with.

60.    During the exchange, Mr. DeRose exhibited mental impairment and memory loss. For example, he appeared confused about the timeline of Ms. Molenda's purchase of the Adobe Sands as well as the purchase of his own property.

61.    Ms. Molenda had to correct his understanding and explain to him that he purchased his residence in 2019, four years after she purchased the Adobe Sands.

62.    Ms. Molenda did not threaten Mr. DeRose during their conversation, and by this time, the police had not been contacted.

63.    Later that day, Mr. DeRose contacted local law enforcement to report the discarded debris along his back property line. Deputies Cree Carter and Wesley Syrett responded to the call.

64.    Upon arrival, Mr. DeRose walked the deputies to the northeast corner of his

property where he pointed out the discarded tree trimmings and damage to his fence.

65.    Although the deputies told Mr. DeRose that they would look into the issue, there is no evidence that an official case or investigation was opened regarding the matter.

66.    Additionally, there is no evidence that the deputies further investigated the matter.

67.    The next day, on July 7, 2021, between 3:00 p.m. and 3:30 p.m., an Adobe Sands tenant disposed of the sticks and other debris on Mr. DeRose's property at Ms. Molenda's request.

68.    Nonetheless, Mr. DeRose filed a written statement with the Garfield County Sheriff's Office on the morning of July 8, 2021.

69.    Based upon Mr. DeRose's statement, the deputies followed up with Mr. DeRose that afternoon. The reason for the follow-up was to address Ms. Molenda's alleged "threats" toward Mr. DeRose for contacting the police.

70.    However, Ms. Molenda had not spoken to Mr. DeRose since prior to his decision to contact police.

71.    In an interview on July 8, 2021, Mr. DeRose explained to the deputies that Ms. Molenda "*insinuated*" that she could "make his life hard" for involving local authorities in such trivial matters.

72.    The deputies made no effort to verify Mr. DeRose's credibility despite his obvious confusion and inability to adequately recall or clarify recent events.

73.    It has since been proven that Mr. DeRose has suffered from advanced Alzheimer's disease and sundown syndrome for many years. Therefore, Mr. DeRose lacks a reliable short-term memory and is easily confused, angered, and agitated, particularly later in the

day.

74.     The deputies asked no further questions about the status of the discarded materials or alleged property damage, focusing entirely on Ms. Molenda's alleged "threats" toward Mr. DeRose for allegedly contacting local authorities.

75.     Again, Mr. DeRose failed to clarify that the conversation with Ms. Molenda that he was referencing occurred *prior* to any contact with police.

76.     Despite Deputy Carter's leading questions and Mr. DeRose's clearly confused responses, the deputies failed to clarify the facts or timeline of events.

77.     The deputies' interview with Mr. DeRose was recorded on body camera.

### *Ms. Molenda's Arrest*

78.     In the afternoon of July 8, 2021, shortly after interviewing Mr. DeRose, the deputies called Ms. Molenda.

79.     During the call, they explained that they needed to talk to her. She explained that she was preparing to shower prior to Bible study but would be available later that evening for a conversation.

80.     Twenty minutes later, the Deputy Carter and Deputy Oldham arrived at the Adobe Sands and immediately arrested Ms. Molenda in the parking lot. The deputies made the arrest without any interview of Ms. Molenda or any other potential witness to the conversation with Mr. DeRose.

81.     Though asked, the deputies did not immediately explain to Ms. Molenda why they were arresting her.  Eventually, while carrying out the arrest, Deputy Carter said he was arresting her "for witness retaliation." In the midst of being patted down and arrested, Ms. Molenda did

not hear him.

82.     Shocked and confused, Ms. Molenda pleaded for her staff—Mr. Blake—to assist her, claiming she felt the deputies' conduct was harassment because she had done nothing wrong.

83.     The deputies ignored Ms. Molenda's visible distress and continued to force her into handcuffs, which she explained were hurting her.

84.     The deputies then inquired about anything she would need to take with her to jail, and Ms. Molenda explained that she would need several specific medications.

85.     The deputies escorted Ms. Molenda, still handcuffed, into the Adobe Sands to obtain her medications. On her way inside, and feeling desperate, she pleaded to a guest for help.

86.     Once inside, Ms. Molenda explained which medications she would need, and Deputy Carter took possession of them.

87.     Ms. Molenda was then led outside where she again asked why she was being arrested. Deputy Carter again said "for witness retaliation" without explaining anything further.

88.     Ms. Molenda in no way resisted the arrest, though she was visibly shaken by the event.

89.     Once outside, Deputy Carter placed Ms. Molenda into the back of his police vehicle and drove her to the Garfield County Jail.

90.     This incident was recorded on Deputy Carter's body camera.

91.     Very soon after Ms. Molenda's arrest, Mr. Blake checked on the status of the sticks in Mr. DeRose's yard. Again, at approximately 5:00 p.m. on July 8, 2021, there was no sign that the sticks had been there. Therefore, it is more than likely that the sticks had been

cleared prior to Ms. Molenda's arrest.

### *Ms. Molenda's Booking and Detention*

92.     Ms. Molenda was booked into the Garfield County Jail in the early evening of

July 8, 2021, at about 5:00 p.m.

93.     Ms. Molenda was instructed to fill out extensive paperwork in which she

explained her medically necessary dietary restrictions and need for prescription medications.

94.     Ms. Molenda explained these medical necessities verbally to the all-male jail

staff.

95.     After filling out the required paperwork, Ms. Molenda was instructed to change

into a jumpsuit.  The jail staff told her she was not entitled to any privacy.  The jail staff also told

her early on that a lack of compliance with their demands would result in additional charges.

96.     Ms. Molenda was then locked in a guarded room to change her clothes. Though

alone in the room, she was surveilled by a security camera.

97.     Ms. Molenda was forced to strip naked in front of the camera because she did not

have any undergarments or layers on when she was arrested (because she was preparing to

shower).

98.     The jail staff took a mug shot of Ms. Molenda. The jail staff then escorted her to a

cell with three cameras inside—one facing the toilet, one angled toward the shower, and another

surveilling the remaining cell area.

99.     The male guards specifically stated that she was to be placed in a cell by herself

and isolated from other inmates.

100.    While locked in her cell, Ms. Molenda witnessed other inmates walking freely

through the halls, using phones, heating up food, and socializing.

101.    Ms. Molenda frequently requested a phone call via her cell's intercom—specifically to contact legal counsel—but was denied. The jail staff informed her that the "one phone call" rule only applied in Hollywood movies but that she could have one call after an upcoming bail hearing.

102.    Although Ms. Molenda asked when her bail hearing would be, the jail staff ignored her question.

103.    After sitting in the cell for hours, Ms. Molenda's chronic back pain and inflammation began to flare up. Although she requested her prescribed pain medication, the jail staff refused to provide it and told her that she would have to "detox."

104.    As a result, Ms. Molenda's chronic inflammation became unbearable, and it took months for the condition to normalize.

105.    Though Ms. Molenda was booked in the late afternoon, she was not provided with a meal on July 8, 2021.

106.    Ms. Molenda's cell was monitored by security cameras, including in the areas designated for showering and using the toilet.

107.    Because of the invasiveness of the surveillance, Ms. Molenda was forced to wait as long as possible before using the toilet.

108.    Because Ms. Molenda was instructed to wear a jumpsuit (other inmates had two-piece uniforms), she was required to take her clothes off entirely to use the restroom. All cell activities were surveilled, and Ms. Molenda had no privacy.

109.    Ms. Molenda did not sleep during the night of her detention because she was

forced to listen to excessively loud music late into the night.

110.    In late morning, on July 9, 2021, Ms. Molenda was offered a meal. This was about twenty minutes before her announced release.

111.    None of the food given to her complied with the dietary restrictions she had previously provided to the jail staff. She could not eat what was given to her.

112.    The jail personnel scolded Ms. Molenda for not expressing gratitude for the food. One staff member got in her face and yelled aggressively: "Do you think you're better than all of us?" Ms. Molenda felt that he was belittling her and trying to elicit a reaction from her. She was too exhausted and traumatized to engage with him.

113.    Ms. Molenda describes this interaction as a 20-minute long "military-style verbal shakedown."

114.    The jail staff then instructed Ms. Molenda to return to the room she had originally changed in and change once again in front of a security camera.

115.    Approximately 45 minutes after being told she would be released, Ms. Molenda was free to leave the jail without being offered any additional information.

116.     Ms. Molenda spent approximately 19 hours in the jail.

### Deputy Carter's Mischaracterization of Events to Show Probable Cause

117.    Sometime after Ms. Molenda was booked into jail, Deputy Carter submitted an Affidavit of Probable Cause to the Sixth District Court based solely on Mr. DeRose's unclarified testimony and Deputy Carter's piecing together of events.

118.    Specifically, and contrary to reality, Deputy Carter alleged under penalty of perjury that on July 7, 2021, Ms. Molenda threatened to make Mr. DeRose's "life hard" after

learning that the police had visited Mr. DeRose on July 6, 2021.

119.    Body camera footage of the interview giving rise to the arrest clearly shows Mr. DeRose's confusion over the events, their timeline, and Deputy Carter's leading of Mr. DeRose down a specific timeline of events.

120.    Again, such allegations were never verified, and Ms. Molenda was never personally interviewed. In fact, no other witness other than Mr. DeRose was ever interviewed.

121.    Had this been done, Deputy Carter would have quickly learned that his alleged understanding of Mr. DeRose's account of his conversation with Ms. Molenda was entirely inaccurate, and there was no lawful basis whatsoever to arrest her.

122.    A magistrate judge found probable cause for Ms. Molenda's arrest based solely on Deputy Carter's wholly inaccurate and unverified sworn statement.

123.    The magistrate judge thereafter ordered Ms. Molenda's release at approximately 8:30 a.m. on July 9, 2021 without a bail hearing.

*Life After her Arrest and Detention*

124.    Following Ms. Molenda's release in the late morning of July 9, 2021, she began experiencing intense post-traumatic stress disorder ("PTSD") for which she sought counseling and psychiatric help.

125.    A symptom of Ms. Molenda's PTSD since her arrest has been a severe inability to sleep. Therefore, for approximately the past two years, Ms. Molenda has relied on strong tranquilizers in order to fall asleep. These medications are often ineffective.

126.    As a result of Ms. Molenda's arrest and detention, she has developed relentless anxiety for which she also takes medication.

127.    The Adobe Sands has also suffered—bills have been paid late, remodels have been stalled and delayed, and Ms. Molenda is now generally overwhelmed and unable to manage the stress of being a business owner.

128.    Since her arrest and incarceration, Ms. Molenda has felt that her only option is to move away, which she believes is what local authorities and residents are attempting to effectuate. However, though she has tried diligently, she has been unable to sell the Adobe Sands.

### Garfield County's Unwarranted Prosecution and the Rightful Dismissal Thereof

129.    Mr. Huntington filed charges against Ms. Molenda on July 9, 2021 for retaliation against a witness, victim, or informant in violation of Utah Code Ann. § 76-8-508.3, a third-degree felony. He also charged her with disorderly conduct, an infraction.

130.    Ms. Molenda's counsel investigated and fought the charges vigorously, believing there was no legitimate basis for the arrest, charges, and prosecution.

131.    This is particularly true given Mr. Huntington's own experiences with Ms. Molenda and his awareness of the negative attitude toward her among local authorities and residents. He has described Ms. Molenda as frequently outspoken at local community meetings.

132.    Mr. Huntington verbally alluded that the real reason he was prosecuting the case against Ms. Molenda was that she was disliked, a problem, and Panguitch wanted her out.

133.    Mr. Huntington thereafter recused himself from the case and enlisted assistance from Piute County's attorney Scott Burns ("Mr. Burns").

134.    After several failures to arrange for Mr. DeRose to testify at a preliminary hearing, Mr. Burns moved to dismiss the case without prejudice on February 25, 2022.

135.    Immediately thereafter, Ms. Molenda began compiling the necessary information and documentation to file a civil rights action against those involved in her arrest, detention, and prosecution.

136.    Unfortunately, word spread of Ms. Molenda's intentions, and on June 15, 2022, new charges were filed by Mr. Burns against Ms. Molenda based on the same July 2021 events.

137.    However, this time, the disorderly conduct charge was replaced by an additional felony: tampering with a witness.

138.    While this case was pending, Mr. Burns stated that he would not dismiss the case because, if he did, Mr. Molenda would file a civil rights lawsuit.

139.    As discovery progressed, Ms. Molenda's counsel demanded some form of evidence that an official case or investigation had been opened or was about to be opened against Ms. Molenda on July 6, 2021 based on Mr. DeRose's complaints regarding debris on his property.

140.    However, the only evidence that any case was opened was an undated statement typed presumably by Deputy Syrett describing the meeting that he and Deputy Carter had with Mr. DeRose on July 6, 2021. The statement was not signed, sworn, dated, or even made on any official letterhead or template.

141.    It is unknown whether the letter was actually drafted in July 2021 or much later in response to counsel's requests for evidence.

142.    It was established during a preliminary hearing that Deputy Syrett was the only individual who would have opened an official case or investigation against Ms. Molenda. It was further established that, in July 2021, Mr. DeRose suffered from Alzheimer's disease and

sundowner's syndrome.

143.    In January 2023, and after Perkins lost the election to current Sheriff Eric

Houston, Chad Dotson, County Attorney for Iron County, Utah, entered his appearance as the

new prosecuting attorney.

144.    Ultimately, Mr. Dotson moved to dismiss the case with prejudice. The Court

dismissed it with prejudice on March 13, 2023.

### *Garfield County's Prevalent History of Constitutional Violations*

145.    Garfield County has a history of violating constitutional rights.

146.    Notably, in or around August 2011, an individual named Matthew Mglej ("Mr.

Mglej") arrived in Boulder, a small town in eastern Garfield County. He was traveling by

motorcycle from Oregon to Texas.

147.    Upon arrival in Boulder, Mr. Mglej's motorcycle began acting up, and he elected

to take it to a mechanic's shop.

148.    There, Mr. Mglej was informed that a new tire would need to be installed.

However, it would take approximately one week for the tire to be delivered.

149.    For that week, Mr. Mglej stayed with the mechanic in his home.

150.    While staying in Boulder, Garfield County deputy Raymond Gardner ("Deputy

Gardner"), approached Mr. Mglej and questioned him about what he was doing in Boulder. Mr.

Mglej was honest about his intentions and the reason for his stay.

151.    Thereafter, while riding his motorcycle around town at low speeds to avoid issues

with his defective tire, Mr. Mglej was pulled over by Deputy Gardner for riding three miles per

hour over the speed limit. Deputy Gardner demanded Mr. Mglej's driver's license, and Mr.

Mglej complied.

152.    Mr. Mglej was not cited or given a warning at this time.

153.    Thereafter, on Mr. Mglej's final night in Boulder and while having dinner with the mechanic, Deputy Gardner knocked on the mechanic's door in civilian attire and asked for Mr. Mglej by name.

154.    Deputy Gardner explained that money was missing from a local convenience store, and Mr. Mglej was the last one seen in the store prior to the money's disappearance.

155.    Mr. Mglej agreed to cooperate but explained that he preferred to first speak with legal counsel before answering any questions. However, while Mr. Mglej was calling legal counsel, Deputy Gardner told him to put his phone down or else he would wrestle him to the ground.

156.    Mr. Mglej then voluntarily let Deputy Gardner arrest him, securing the handcuffs extremely tightly on his wrists.

157.    Mr. Mglej was escorted to Deputy Gardner's police vehicle, and Deputy Gardner informed Mr. Mglej that he would have to stop at his personal residence to change into his police uniform before taking Mr. Mglej to jail.

158.    Deputy Gardner left Mr. Mglej in his police vehicle, unlocked, while he changed his clothes.

159.    By the time Officer Gardner returned, Mr. Mglej's hands were purple and numb from the handcuffs. He explained this and asked that they be loosened before starting the long drive to the Garfield County Jail in Panguitch.

160.    The handcuff key, however, would not work, and Deputy Gardner was forced to

attempt to break the handcuffs with various tools in his personal garage. The tools included a saw, hammer, screwdriver, wrenches, vice grips, etc.

161.    The handcuffs became deformed and tightened further around Mr. Mglej's wrists.

162.    Eventually, Deputy Gardner was able to pry both cuffs off, but not before causing nerve damage to Mr. Mglej's wrists.

163.    About thirty minutes into the drive to the Garfield County Jail, Deputy Gardner received a call from the convenience store informing him that they had miscounted the money in the cash register, and nothing had been stolen.

164.    Nonetheless, Deputy Gardner drove to the Garfield County Jail where he browsed the Utah Code in search of an offense for which he could book Mr. Mglej. He ultimately charged Mr. Mglej with Failure to Disclose Identity and Obstruction of Justice.

165.    Mr. Mglej was booked into jail and informed that he could not contact legal counsel because that "only happened in the movies."

166.    Mr. Mglej informed the jail staff of his dairy allergies and other dietary restrictions. Nonetheless, his first meal in jail was a sandwich with only cheese and mayonnaise. The jail staff teased him about his allergies to dairy and continued to offer him only dairy-based foods.

167.    Mr. Mglej spent approximately two days in the jail until he appeared before a judge who refused to believe his stories of mistreatment by police. Despite this, and the judge's later recusal, Mr. Mglej was granted bail in the amount of $1,000.

168.    On August 11, 2011, Mr. Mglej's debit card was charged $1,000 for "Justice Court Fines," but he remained in jail for two more days. Jail staff told him that he was being

taught a lesson in patience.

169.    On August 17, 2011, bail was finally posted on the court's docket and Mr. Mglej was released.

170.    Without any means of transportation, Mr. Mglej was forced to hitchhike 100 miles to Boulder. Upon arrival, he learned that his motorcycle had been vandalized and stripped for parts.

171.    The charges against Mr. Mglej were eventually dismissed.

172.    In 2014, Mr. Mglej brought a civil rights action alleging violation of his constitutional rights.

173.    Unfortunately, other instances of Garfield County abuse have been recorded. For instance, in 2021, a 19-year-old woman was allegedly seen by a Garfield County Sheriff's Deputy stepping on a "Back the Blue" sign before throwing it in the trash.

174.    The woman was charged with a hate crime based on a Utah statue only four other states in the country have adopted due to free speech concerns. For this form of expression, she faced up to a year in jail.

175.    Mr. Huntington agreed to prosecute this case, with Sheriff Perkins's passionate support.

176.    The statute and its enforcement have since been criticized extensively by constitutional experts who state the law stands as a harsh deprivation of necessary and basic rights to free speech and expression against government authorities.

177.    Even the Garfield County Sheriff's Office's treatment toward Ms. Molenda's tenant who set off a firecracker—shoving him into the side of a vehicle so hard his ribs were

bruised—appears as a clear disregard for basic human protections.

178.    These instances, compounded by the Garfield County Sheriff's Office's hostility toward Ms. Molenda and those she employs and/or with whom she associates, establish an unquestionable pattern of blatant indifference toward basic civil liberties that must be stopped.

## FIRST CAUSE OF ACTION

**(Unlawful Arrest and Detention under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution as against Garfield County, Garfield County Sheriff's Office, Deputy Carter, and Deputy Oldham)**

179.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

180.    At the time of Ms. Molenda's arrest, Deputy Carter and Deputy Oldham were authorized agents of Garfield County and Garfield County Sheriff's Office, acting under the color of Utah state law.

181.    The deputies arrested and handcuffed Ms. Molenda based on misinformation from a mentally impaired witness—Mr. DeRose—who did not adequately confirm or verify the basis for the arrest. In fact, the deputies fed information to Mr. DeRose, who clearly did not understand what they were referring to or their intentions.

182.    The deputies did not interview Ms. Molenda or any other potential witness prior to arresting her.

183.    The deputies did not have a warrant to arrest Ms. Molenda.

184.    The deputies knew or reasonably should have known that no crime had taken place when they arrested Ms. Molenda.

185.    The deputies handcuffed Ms. Molenda and placed her in a patrol vehicle, showing

that their actions were under the color of Utah state law.

186.    The deputies took Ms. Molenda to the Garfield County Jail in handcuffs despite knowing that no crime had taken place.

187.    Therefore, the deputies knew or should have known that no crime had taken place. Yet, they continued to detain Ms. Molenda.

188.    The deputies' actions were based on practices and customs of the Garfield County Sheriff's Office.

189.    Ms. Molenda enjoyed the constitutional right to be free from unreasonable searches and seizures.

190.    The deputies demonstrated deliberate indifference as to Ms. Molenda's constitutionally protected rights.

191.    As a result of Deputies Carter and Oldham's unlawful seizure, they caused a violation of Ms. Molenda's constitutional rights.

192.    The deputies intentionally and with malice violated Mr. Molenda's federally protected rights in violation of 42 U.S.C. § 1983.

193.    As a result of the deputies' actions, Ms. Molenda suffered approximately 19 hours of poor and abusive treatment in the Garfield County Jail.

194.    As a result of the deputies' actions, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

195.    Ms. Molenda is also entitled to attorneys' fees, costs and expert witness fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

**(Malicious Prosecution under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution as against Garfield County, Garfield County Sheriff's Office, Deputy Carter, Deputy Syrett, Deputy Oldham, Barry Huntington, and Scott Burns)**

196.     Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

197.     The deputies, acting as agents of Garfield County and the Garfield County Sheriff's Office, and under color of Utah state law, arrested and booked Ms. Molenda into jail charging her with retaliation against a witness, victim, or informant and disorderly conduct, thus commencing a criminal proceeding against Ms. Molenda.

198.     These charges against Ms. Molenda were dismissed without prejudice on February 25, 2022, resulting in termination of the action in favor of Ms. Molenda because she did not retaliate against a witness, victim, or informant or conduct herself in an unlawfully disorderly manner during her arrest.

199.     Charges were then refiled against Ms. Molenda based on the same facts on June 15, 2022, this time replacing the disorderly conduct infraction charge with a third-degree felony charge for tampering with a witness.

200.     These charges were subsequently dismissed with prejudice on March 13, 2023, resulting in termination of the action (again) in favor of Mr. Molenda.

201.     As a result of Defendants' actions, Ms. Molenda suffered approximately 19 hours of poor and abusive treatment in the Garfield County Jail.

202.     Defendants maliciously initiated the criminal proceedings without the intention of bringing an offender to justice.

203.     As a result of the deputies' actions, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

204.     Ms. Molenda is also entitled to attorneys' fees, costs and expert witness fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION**

**(Cruel and Unusual Punishment under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution as against Garfield County, Garfield County Sheriff's Office, Garfield County Jail, and Doe Officers)**

205.     Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

206.     Ms. Molenda informed the Doe Officers in the Garfield County Jail of her need for certain prescribed medications. The Doe Officers, despite Ms. Molenda informing them of her need for certain prescribed medications, denied her those medications while she was detained in the Garfield County Jail.

207.     While detained in the Garfield County Jail, Ms. Molenda's chronic back pain began to flare up. Although she requested her prescribed medications, jail staff told her she would have to "detox."

208.     Ms. Molenda informed the Doe Officers of her dietary restrictions both on paper and verbally. Despite this, the one meal that the jail staff offered her was made up entirely of foods she could not eat. When she refused to eat the food, she was scolded loudly and chastised for thinking she was "better than everyone else."

209.     Ms. Molenda was required to change her clothes, use the bathroom, and shower

under video surveillance by an all-male jail staff.

210.    Ms. Molenda was locked in an isolated cell, without a cellmate or the ability to leave her cell, for approximately 19 hours. During this time, she witnessed other inmates walking around the jail, socializing, heating food, and talking on the phone.

211.    Ms. Molenda was not permitted to make any outgoing calls, despite her requests, for the entire duration of her detention at the jail. She requested numerous times to speak with legal counsel and was denied.

212.    Ms. Molenda was forced to listen to loud music late into the night and, as a result, could not sleep while detained in the jail.

213.    Ms. Molenda continues to experience the trauma inflicted on her while she was detained.

214.    The Doe Officers were agents of Garfield County, Garfield County Sheriff's Office, and the Garfield County Jail when they caused severe and permanent damage to Ms. Molenda while acting under the color of Utah state law.

215.    The treatment of Ms. Molenda by the Doe Officers was consistent with the customs and practices of the Garfield County Sheriff's Office and the Garfield County Jail.

216.    As a result of the actions taken by the Doe Officers of Garfield County Jail, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

217.    Ms. Molenda is also entitled to attorneys' fees, costs and expert witness fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## **FOURTH CAUSE OF ACTION**

**(Violation of Rights to Privacy under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution as against Garfield County, Garfield County Jail, and Doe Officers)**

218.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

219.    Ms. Molenda possessed certain rights to privacy while detained in the Garfield County Jail.

220.    The Doe Officers violated Ms. Molenda's constitutional rights to privacy by forcing her to undress and change into and out of a single-piece jumpsuit in front of a surveillance camera. Ms. Molenda had no undergarments on.

221.    The Doe Officers violated Ms. Molenda's constitutional rights to privacy by forcing her to use the toilet and shower in front of surveillance cameras. Because Ms. Molenda was in a single-piece jumpsuit – unlike other inmates – she was required to take off her clothes entirely in order to use the toilet.

222.    The Doe Officers made no effort to protect Ms. Molenda's privacy and, in fact, deliberately and maliciously violated her rights with punitive intent.

223.    The Doe Officers' violations of Ms. Molenda's rights to privacy were intentionally degrading and humiliating.

224.    The Doe Officers' privacy violations are based upon an arbitrary or irrational justification or no justification at all.

225.    The Doe Officers' privacy violations in no way supported an interest in security.

226.    The Doe Officers were agents of Garfield County and the Garfield County Jail

when they caused damage to Ms. Molenda while acting under the color of Utah state law.

227.    The treatment of Ms. Molenda by the Doe Officers was consistent with the customs and practices of the Garfield County Jail.

228.    As a result of the actions taken by the Doe Officers of Garfield County Jail, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

229.    Ms. Molenda is also entitled to attorneys' fees, costs and expert witness fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## FIFTH CAUSE OF ACTION

**(Unlawful Arrest and Detention under the Utah Constitution Article I, Section 14 as against Garfield County, Garfield County Sheriff's Office, Deputy Carter, and Deputy Oldham)**

230.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

231.    At the time of Ms. Molenda's arrest, Deputies Carter and Oldham were authorized agents of Garfield County and Garfield County Sheriff's Office, acting under the color of Utah state law.

232.    Ms. Molenda was handcuffed and arrested by Deputy Carter and Deputy Oldham based on misinformation from an unreliable witness who did not adequately confirm the basis for the arrest. In fact, the deputies fed information to the witness who did not clearly understand what they were referring to or their intentions.

233.    The deputies did not interview Ms. Molenda or any other potential witness prior to arresting her.

234.    The deputies did not have a warrant to arrest Ms. Molenda.

235.    The deputies knew or reasonably should have known that no crime had taken place when they arrested Ms. Molenda.

236.    The deputies handcuffed Ms. Molenda and placed her in a patrol vehicle, showing that their actions were under the color of Utah state law.

237.    The deputies took Ms. Molenda to the Garfield County Jail in handcuffs despite knowing that no crime had taken place.

238.    Therefore, the deputies knew or should have known that no crime had taken place but continued to detain Ms. Molenda.

239.    The deputies' actions were based on practices and customs of the Garfield County Sheriff's Office.

240.    Ms. Molenda enjoyed the constitutional right to be free from unreasonable searches and seizures.

241.    The deputies demonstrated deliberate indifference as to Ms. Molenda's federally protected rights.

242.    As a result of the deputies' unlawful seizure of Ms. Molenda, they caused a violation of her constitutional rights.

243.    The deputies intentionally and with malice violated Ms. Molenda's constitutional rights.

244.    Article I, Section 14 of the Utah Constitution is self-executing.

245.    The deputies' actions caused Ms. Molenda to suffer a flagrant violation of her constitutional rights because her rights against unlawful arrest and detention were sufficiently

clear that a reasonable official would understand that the deputies' actions violated her rights.

246.    Existing remedies besides money damages do not redress the lasting injuries that Ms. Molenda has suffered.

247.    Equitable relief, such as an injunction, was and is wholly inadequate to protect Ms. Molenda's rights or to redress her injuries.

248.    As a result of the deputies' actions, Ms. Molenda suffered approximately 19 hours of poor and abusive treatment in the Garfield County Jail.

249.    As a result of the deputies' actions, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

250.    Ms. Molenda has been forced to retain counsel and has incurred attorneys' fees and is entitled to reimbursement for such.

## SIXTH CAUSE OF ACTION

**(Malicious Prosecution under the Utah Constitution Article I, Section 7, and Section 14, as against Garfield County, Garfield County Sheriff's Office, Deputy Carter, Deputy Syrett, Deputy Oldham, Barry Huntington, and Scott Burns)**

251.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

252.    Deputies Carter and Oldham, acting as agents of Garfield County and the Garfield County Sheriff's Office, and under color of Utah state law, arrested and booked Ms. Molenda into jail, charging her with retaliation against a witness, victim, or informant and disorderly conduct, thus commencing a criminal proceeding against her.

253.    These charges against Ms. Molenda were dismissed without prejudice on

February 25, 2022, resulting in termination of the action in favor of Ms. Molenda because she did not retaliate against a witness, victim, or informant or conduct herself in an unlawfully disorderly manner during her arrest.

254.    Charges were then refiled against Ms. Molenda based on the same facts on June 15, 2022, this time replacing disorderly conduct, an infraction, with tampering with a witness, a third-degree felony.

255.    These charges were subsequently dismissed with prejudice on March 13, 2023, resulting in termination of the action (again) in favor of Ms. Molenda because she did not retaliate against a witness, victim, or informant or tamper with a witness.

256.    As a result of Defendants' actions, Ms. Molenda suffered approximately 19 hours of poor and abusive treatment in the Garfield County Jail.

257.    These criminal proceedings and confinement of Ms. Molenda were initiated maliciously because there was no legitimate evidence to support her detention.

258.    Article I, Sections 7 and 14 of the Utah Constitution are self-executing.

259.    The deputies' actions caused Ms. Molenda to suffer a flagrant violation of her constitutional rights because her right against malicious prosecution was sufficiently clear that a reasonable official would understand that the deputies' actions violated her rights.

260.    Existing remedies, besides money damage, do not redress the lasting injuries that Ms. Molenda has suffered.

261.    Equitable relief, such as an injunction, was and is wholly inadequate to protect Ms. Molenda's rights or to redress her injuries.

262.    As a result of the deputies' actions, Ms. Molenda suffered approximately 19 hours

of poor and abusive treatment in the Garfield County Jail.

263.    As a result of the deputies' actions, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

264.    Ms. Molenda has been forced to retain counsel and has incurred attorneys' fees and is entitled to reimbursement for such.

## SEVENTH CAUSE OF ACTION

**(Abuse of Process as against Garfield County, Garfield County Sheriff's Office, Deputy Carter, Deputy Syrett, Deputy Oldham, Barry Huntington, and Scott Burns)**

265.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

266.    Deputies Carter and Oldham, acting as agents of Garfield County and the Garfield County Sheriff's Office, and under color of Utah state law, arrested and booked Ms. Molenda into jail charging her with retaliation against a witness, victim, or informant and disorderly conduct, thus commencing a criminal proceeding against her.

267.    The purpose of Mr. Molenda's arrest, jail booking, 19-hour detention, and subsequent prosecutions was to send a message to her that she is not welcome in Garfield County and to force her to sell the Adobe Sands and relocate away from Garfield County.

268.    These criminal proceedings and confinement of Ms. Molenda were initiated maliciously because there was no legitimate evidence to support her arrest, detention, and prosecution.

269.    As a result of Defendants' actions, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive

damages in an amount to be proven at trial.

270.    Ms. Molenda has been forced to retain counsel and has incurred attorneys' fees and is entitled to reimbursement for such.

## EIGHTH CAUSE OF ACTION

**(Cruel and Unusual Punishment under the Utah Constitution Article I, Section 9 as against Garfield County, Garfield County Sheriff's Office, Garfield County Jail, and Doe Officers)**

271.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

272.    Ms. Molenda informed the Doe Officers in the Garfield County Jail of her need for certain prescribed medications. The Doe Officers, in spite of Ms. Molenda informing them of her need for certain prescribed medications, denied her of those medications while detained in the Garfield County Jail.

273.    While detained in the Garfield County Jail, Ms. Molenda's chronic back pain began to flare up. Although she requested her medications, jail staff told her she would have to "detox."

274.    Ms. Molenda informed the Doe Officers of her dietary restrictions both on paper and verbally. Despite this, the one meal she was offered was made up entirely of foods she could not eat. When she refused to eat the food, jail staff loudly scolded and chastised her for thinking she was "better than everyone else."

275.    Ms. Molenda was required to change her clothes, use the bathroom, and shower under video surveillance by an all-male jail staff.

276.    Ms. Molenda was locked in an isolated cell, without a cellmate or the ability to leave her cell, for approximately 19 hours. During this time, Ms. Molenda witnessed other

inmates walking around the jail, socializing, heating food, and talking on the phone.

277.    Ms. Molenda was not permitted to make any outgoing calls, despite her requests, for the entire duration of her detention at the Garfield County Jail. She requested numerous times to speak with an attorney and was denied access to a phone.

278.    Ms. Molenda was forced to listen to loud music late into the night and, as a result, did not sleep while detained in the Garfield County Jail.

279.    Ms. Molenda continues to work through the trauma inflicted on her while detained.

280.    The Doe Officers were agents of Garfield County and Garfield County Sheriff's Office, and Garfield County Jail when they caused damage to Ms. Molenda while acting under the color of Utah state law.

281.    The treatment of Ms. Molenda by the Doe Officers was consistent with the customs and practices of the Garfield County Sheriff's Office and the Garfield County Jail.

282.    The Doe Officers acted maliciously in an effort to dispossess Ms. Molenda of her constitutional rights.

283.    Article I, Section 9 of the Utah Constitution is self-executing.

284.    The Doe Officers' actions caused Ms. Molenda to suffer a flagrant violation of her constitutional rights because Ms. Molenda's right against cruel and unusual punishment was sufficiently clear that a reasonable official would understand that the Doe Officers' actions violated Ms. Molenda's rights.

285.    Existing remedies besides money damages do not redress the lasting injuries that Ms. Molenda has suffered.

286.    Equitable relief, such as an injunction, was and is wholly inadequate to protect Ms. Molenda's rights or to redress her injuries.

287.    As a result of the Doe Officers' actions, Ms. Molenda suffered approximately 19 hours of poor and abusive treatment in the Garfield County Jail.

288.    As a result of the Doe Officers' actions, Ms. Molenda was severely and permanently damaged and is entitled to recover general, compensatory, actual, consequential, and punitive damages in an amount to be proven at trial.

289.    Ms. Molenda has been forced to retain counsel and has incurred attorneys' fees and is entitled to reimbursement for such.

## NINTH CAUSE OF ACTION

**(Civil Conspiracy as against Perkins, Deputy Carter, Deputy Syrett, Deputy Oldham, Barry Huntington, and Scott Burns)**

290.    Ms. Molenda hereby incorporates and re-alleges all preceding paragraphs as though fully set forth herein.

291.    During the course of events described above, a combination of two or more persons was formed, namely Perkins, Deputies Carter, Syrett, and Oldham, and Attorneys Barry Huntington and Scott Burns.

292.    This combination of Defendants had specific objects to be accomplished, including maliciously arresting, charging, and prosecuting Ms. Molenda in deprivation of her rights in order to force her out of Panguitch.

293.    There was a meeting of the minds and agreement as to these objects and the ultimate goal.

294.    Defendants engaged knowingly and voluntarily in one or more unlawful, overt

acts in furtherance of these objects, as set forth herein.

295.    As a direct and proximate result of Defendants' conduct, Ms. Molenda has

suffered damages in an amount to be proven at trial.

296.    Defendants intentionally damaged Ms. Molenda by depriving her of her civil

rights in numerous ways. As a result of these willful and malicious wrongdoings, these

Defendants are liable for punitive damages and all attorney fees and costs expended in this

action.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Molenda prays as follows:

1.    For an award of general, compensatory, actual, consequential, and punitive

damages in an amount to be proven at trial;

2.    For an award of attorneys' fees and costs of suit pursuant to Utah law, 42 U.S.C. §

1983, 42 U.S.C. § 1988 and Rule 54 of the Utah Rules of Civil Procedure;

3.    For punitive damages based on Defendants' intentional misconduct;

4.    For such of and further relief as this Court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Molenda hereby

demands a trial by jury in this matter on all triable issues.

DATED this 27th day of November 2023.

CLYDE SNOW & SESSIONS

*/s/ Jake Taylor*
Jake Taylor
Emma D. Tanner
*Attorneys for Plaintiff Jenelle Molenda*